**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| TESSA RRGC CHILDRESS, )<br>  )<br>   Plaintiff, )<br>  )<br> vs. )<br>  )<br> CITY OF NORTH CHARLESTON, )<br> SOUTH CAROLINA, JESSE R. DEMALO, )<br> individually and in her official capacity, and )<br> THOMAS E. BENNETT, individually and in )<br> his official capacity, )<br>  )<br>   Defendants. )<br> _____) | No. 2:17-cv-985-DCN<br><br>**ORDER** |

The following matter is before the court on defendants City of North Charleston ("the City"), Jesse Demalo ("Demalo"), and Thomas Bennett's ("Bennett")(collectively, "defendants") motion for summary judgment, ECF No. 46.  For the reasons set forth below, the court grants the motion for summary judgment as to the Fifth Amendment and Fourteenth Amendment claims against Demalo, and as to the Fifth Amendment, Fourteenth Amendment, stop and seizure, and false arrest claims against Bennett.  The court denies the motion as to the stop and seizure, excessive force, and false arrest claims against Demalo and as to the excessive force claim against Bennett.  In addition, at the hearing on the motion, the parties agreed to dismissal without prejudice of the state law claims against the City.

## I.  BACKGROUND

This case arises out of the arrest of plaintiff Tessa RRGC Childress ("Childress").  The following facts are undisputed.  On March 4, 2015 around 9:30 p.m., someone called 911 to report two suspicious people and a suspicious vehicle in the parking lot of the

caller's apartment complex. ECF No. 46-2 at 2. The caller described a white female around the age of 20 wearing a sweatshirt and shorts, a black male around the age of 20, and a red truck. The 911 caller did not report any criminal or illegal activity, and she provided her name and phone number. The area where the apartment complex is located is generally regarded as a high crime area. ECF No. 46-3, Childress Depo. 16:5–17:17; ECF No. 46-4, Demalo Depo. 70:8–13. Demalo was dispatched to the scene to investigate. It was dark, and Demalo was alone. Demalo Depo. 71:10–13.

Childress explained that she was at the apartment complex because her mother lived there. Childress Depo. 85:14–24. Childress had just returned from a day trip to Fort Mill, South Carolina, and she was going for a quick walk in the neighborhood, which is something she normally does. Id. When Demalo arrived at the scene, she saw Childress, who matched the description of the woman provided on the 911 call. Demalo Depo. 10:11–14. Demalo explained to Childress why she was there and asked Childress for identification. Childress Depo. 98:15–20; Demalo Depo. 10:19–11:6. At this point, Childress's and Demalo's descriptions of the events diverge.

Childress claimed that she provided her name and told Demalo that she lived in the complex, providing her mother's address. Childress Depo. 94:6–13. Childress told Demalo that her identification was in her purse inside her mother's home and that she would go retrieve it. Id. at 101:11–13. In an email to the police department, Childress claimed that Demalo "screamed at [her] to stop" and Childress stopped. ECF No. 46-5 at 1. Childress then explained that Demalo "approached [her] and intimidated [her] with a condescending question as to what [she] was doing and where [she] was going." Id. Childress said that she thought she said "something to the effect of not being an animal or

dog on the loose and that [she] was going to get [her] S. C. D. L. [sic] because the police officer had asked [her] for [her] I.D." Id. Childress then claimed that she began walking towards her residence for a third time when Demalo grabbed her. Id.

However, in her deposition, Childress said that when she turned to walk inside to get her identification the first time, Demalo grabbed Childress's arm and hands. Childress Depo. 101:11–17. Then Demalo's grip got tighter, which hurt Childress, so Childress started to pull away and grabbed onto a nearby fence because it was "something sturdy that would help [her] kind of get out of [Demalo's] grasp." Id. at 101:19–25. Childress then said that she reached for her phone to call 911 to report that she was being assaulted, and at that point, Demalo threatened to use her taser gun. Id. at 101:25–102:2. She then claimed that Demalo put her hand up Childress's shirt and pinched Childress's breast and twisted her nipple. Id. at 102:2–4. Childress said this happened very quickly and while she was on the phone with 911 so that she was able to tell 911 that Demalo "had just tried to tear my breast off." Id. at 104:11–15. However, on the 911 call recording, Childress told the 911 operator that "now she just squeezed my breast." ECF No. 62-2, 911 Call Recording at 8:33. Childress then said she "was thrown head first to the ground, and my head popped -- felt like my head popped off, and I sent out a bloodcurdling scream." Childress Depo. at 103:6–9. She then stated that she blacked out and couldn't "tell you why [she] ended up in the position [she] ended up in." Id. at 103:1–4; 13–16.

According to Demalo, when Demalo asked Childress if she lived in the apartment complex, Childress stated that she lived there and just pointed in a general direction, not at an exact residence. Demalo Depo. 11:2–6. Demalo stated that Childress would not

give Demalo her name and date of birth but instead told Demalo to run the license plate of Childress's truck to confirm her identify.  Id. at 11:11–15; 73:7.  Demalo explained that she could not verify that Childress lived in the apartment complex by running her license plate.  Id. at 11:17–20.  At that point, Demalo said that Childress "became a little agitated," so Demalo asked for her supervisor to come to the scene.  Id. at 11:20–13:4.  Demalo explained that Childress tried to walk away, and that she and Childress "were still kind of going at this little back and forth."  Id. 13:12–14:5.  Demalo kept asking for Childress's name and date of birth and Childress kept trying to walk away, so Demalo grabbed Childress's shoulder and told her to stop.  Id. at 14:5–12.  Childress then said "Oh my god, did you just grab me?" and according to Demalo, "things kind of went downhill from there."  Id. at 14:21–23.

Demalo explained that Childress grabbed the fence and was "kind of like bear-hugging" it.  Id. at 15: 1–6.  Demalo stated that she was behind Childress and had both of her hands on top of Childress's hands to try to get Childress's arms open.  Id. at 15:11–13.  Childress called 911, and at the time, Demalo did not know who Childress was calling.  Id. at 23:7–21.  Demalo explained that she had not yet located the reported suspicious male, and that she was concerned that Childress was calling someone to come ambush or attack Demalo, especially because a crowd was beginning to gather.  Id. at 74:5–75:9.  As a result of Demalo being alone, in the dark, not having searched Childress, and not knowing where the suspicious man was, Demalo stated that her suspicion was raised.  Id. at 75:5–11.

Demalo explained that she then asked for an assisting unit because she could not get Childress under control.  Id. at 24:19–22.  Demalo stated that Childress was actively

struggling with her, and that she did not know for certain whether Childress kicked or hit

her because "it was happening so fast." Id. at 76:23–77:12. Neither party has explained

whether Demalo denied grabbing Childress's breast.[1] Bennett arrived in response to the

call, and the officers tried to put handcuffs on Childress. Id. at 25:9–21. During that

struggle, Demalo said that Childress and Bennett both fell to the ground. Id. at 25:20–21.

Demalo explained that "I think while we were getting, trying to get her, get control of the

situation, somewhere maybe she went limp or her, the footing was lost. So, maybe

together with us trying to get her in, into custody and her own situation or maybe the

natural elements of the ground, all of that in total resulted in her up on the ground, ending

up on the ground." Id. at 31:2–9. After Childress hit the ground, she yelled out

something like "I think my hip is broken" and Demalo called for EMS. Id. at 31:15–19.

Bennett's account of the incident comports with Demalo's account. Bennett said

that when he arrived at the scene, he observed Demalo and Childress "tussling," with

Demalo attempting to remove Childress's arms from the fence and get them behind her

back "so she could, I guess, effect the arrest." ECF No. 46-6, Bennett Depo. 11:15–25.

Bennet described Childress as "uncooperating" and "pulling her arm away, yelling and

screaming." Id. at 12:3–7. He believed that Demalo was effectuating a lawful arrest and

went to assist her. Id. at 12:17–19. Bennett described his role, stating that he "removed

[Childress] from the post, [he] tried to grab her other arm to get it behind her back, she

pulled it away from [him], at which time [he] realized that the standing up part was not

working out." Id. at 13:7–11. Bennett then stated that he "placed [his] arms on both are

---

[1] Defendants attached a portion of Demalo's deposition in which counsel asked Demalo
"At anytime, did you go under [Childress's] shirt?" but defendants did not provide the
next page of the deposition that contains Demalo's answer. Demalo Depo. 15:25.

both her [sic], both her arms and [he] looked over to the side and [he] saw a grass area where [hr] figured this could be a good spot to take her to the ground, which [he is] trained to do through South Carolina Criminal Justice Academy." Id. at 13:11–16. Bennett then explained that "[a]s [he] took [his] left leg to step back to take [Childress] to the ground safely, it was which time [sic] the defendant [Childress] went limp, as [he] would say, caused [him] to lose [his] balance to that weight shift, and [they] both fell to the ground with [him] landing on top of her." Id. at 13:16–21. Then at that point, Bennett and Demalo handcuffed Childress, and EMS was called.

Childress was taken to the hospital, where it was determined that she dislocated her hip. After Childress received medical attention, she was taken to the police station to be processed. Demalo issued two tickets to Childress for disorderly conduct and for resisting arrest. ECF No. 56-1 at 17–18. Several months later, Childress emailed North Charleston Police Department ("NCPD") to report this "police brutality." ECF No. 46-5 at 1. The NCPD investigated the incident and issued a report. ECF No. 55-1. As a result of the investigation, Demalo was suspended for two weeks without pay and had to attend a remedial training program for about two months. ECF No. 51-4, Demalo Depo. 45:16–19.

Childress filed her complaint in the state court on March 3, 2017, bringing claims for malicious prosecution by the City, gross negligence by the City, violation of state civil rights by the City, and violation of federal civil rights pursuant to 42 U.S.C. § 1983 by the City, Demalo, and Bennett. The City removed the case to federal court on April 17, 2017, and on April 24, 2017, defendants filed a motion seeking to dismiss the two civil rights causes of action against the City, ECF No. 4. Childress sought an extension

of time to file a response, ECF No. 7, which the court permitted, ECF No. 8; however, Childress never filed a response. Therefore, the court granted the motion to dismiss, ECF No. 10, and the remaining claims now before the court are malicious prosecution and gross negligence against the City, and § 1983 claims against Demalo and Bennett.

Defendants filed their motion for summary judgment on March 15, 2019. ECF No. 46. Childress responded on April 28, 2019, ECF No. 51, and defendants replied on May 6, 2019, ECF No. 53. The court held a hearing on the motion on August 21, 2019.

## II. STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Any reasonable inferences are to be drawn in favor of the nonmoving party. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere

speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson , 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III.   DISCUSSION

Before diving into the substance of Childress's claims, it is worth first addressing a couple ancillary arguments made by the parties. The first relates to the court's ability to consider the post-incident internal investigation report that cited Demalo for NCPD policy violations. Defendants argue that this report is inadmissible as a subsequent remedial measure, but that even if the court does consider the report, an NCPD policy violation alone does not amount to a violation of constitutional rights. Childress argues that the report is admissible because it states that "[i]f you do answer the question, neither your statements nor any information that is gained by reason of such statements can be used against you in any subsequent criminal proceeding, but can be used against you in any disciplinary, administrative or civil proceeding." ECF No. 51-1 at 20 (citing ECF No. 56-1 at 1). Childress argues that this is a civil proceeding and therefore use of the report should be allowed.

Defendants are correct in that an NCPD policy violation alone does not constitute a constitutional violation. See Johnson v. S.C. Dep't of Corr., 2007 WL 904826, at *12

(D.S.C. Mar. 21, 2007) ("Plaintiff's allegation that Defendants did not follow their own policies fails, as the failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation.").  However, both parties' arguments about the admissibility of this document are unconvincing.  First considering Childress's argument, the portion of the report quoted by Childress comes from the "administrative internal investigation garrity warning" and simply informs the officer who is making a statement that her statement <u>could</u> be used in a civil proceeding.  It does not deem the entire report admissible in a civil proceeding.  Moreover, a disclaimer on an internal investigation report does not trump the Federal Rules of Evidence.

However, defendants miss the mark with their argument as well.  Pursuant to Rule 407 of the Federal Rules of Evidence, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent remedial measure is not admissible to prove . . . culpable conduct."  This rule of evidence is meant to encourage defendants to fix dangerous conditions that allegedly caused harm without being concerned that doing so would be used as an admission of liability.  Here, the investigation report simply looked into the alleged wrongdoing to determine if NCPD needed to take any action against Demalo.  The report is not a "measure . . . that would have made an earlier injury or harm less likely to occur."  <u>See also</u> <u>Misener v. Gen.</u> <u>Motors</u>, 924 F. Supp. 130, 133 (D. Utah 1996) ("Rule 407, F.R.E. does not apply to post event reports and investigations.").  Absent any other challenges to the admissibility of

this report, the court finds that the report is admissible and will consider it in determining whether summary judgment is warranted.[2]

The second argument relates to the reinstatement of Childress's <u>Monell</u> claim, which is Childress's § 1983 cause of action against the City.  The court dismissed this claim after Childress failed to respond to defendants' motion to dismiss seeking dismissal of the claim.  Childress brings the claim up again in a rather vague manner, stating that "it could also be argued that this type of conduct [by police officers] could also be the basis of a <u>Monell</u> violation."  ECF No. 51-1 at 12.  She does not explicitly argue that her <u>Monell</u> claim should be reinstated, but defendants contend that even if the court interprets this comment as seeking reinstatement, the court should not grant the request.  The court agrees with defendants.  First, it is unclear whether or not Childress wants the renewed ability to pursue this claim.  Even if she does, she did not file any sort of motion to reconsider nor has she offered any reason as to why the court should reinstate the claim.  As such, to the extent Childress argues that she should be permitted to pursue her <u>Monell</u> claim, the court denies her request.

Turning back to the main substance of defendants' motion, defendants argue that Demalo and Bennett are entitled to summary judgment because they are entitled to qualified immunity.  Defendants also argue that the City is entitled to summary judgment based upon Childress's failure to prove the elements of malicious prosecution and upon immunities in the South Carolina Tort Claims Act ("SCTCA").

---

[2] The court's ruling is limited to the report's admissibility as a subsequent remedial measure.  The parties are free to make any other arguments regarding the report's admissibility prior to or at trial.

## A. Qualified Immunity for Demalo and Bennett

Defendants first argue that Demalo and Bennett are entitled to qualified immunity. The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Qualified immunity provides 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam). To determine whether an official is entitled to qualified immunity, courts employ a two-step test that is set out by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001). The court must first consider whether a constitutional violation occurred. Saucier, 533 U.S. at 201. If a violation did occur, then the court must determine whether the right violated was clearly established. Id. A right is "clearly established" when it is

"sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013).

Defendants argue that Demalo and Bennett are entitled to summary judgment under both prongs of the qualified immunity test. In other words, defendants argue that no constitutional violation occurred, and that even if a constitutional violation did occur, that a reasonable officer would not have known that his conduct violated a clearly established right. The constitutional violations alleged here arise under the Fourth, Fifth, and Fourteenth Amendments. Under the Fourth Amendment, Childress alleges illegal stop and seizure, excessive force, and false arrest. The court addresses each in turn.

### a. Stop and Seizure

Childress's first claim of a constitutional violation relates to the Terry stop. While not made entirely clear, it appears that she challenges both the initial stop and the subsequent seizure. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," Illinois v. Wardlow, 528 U.S. 119, 123 (2000), which is known as a Terry stop. Reasonable suspicion "requires at least a minimal level of objective justification for making the stop" and must be based on "more than an 'inchoate and unparticularized suspicion or hunch of criminal activity." Id. at 123–24. To determine whether an officer had reasonable suspicion, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Indeed, "[c]ourts must look at the 'cumulative information available' to the officer" at the time of the stop. United States v. Branch, 537

F.3d 328, 337 (4th Cir. 2008) (quoting <u>Arvizu</u>, 534 U.S at 273). The factors that defendants argue are relevant here and that may be considered in determining whether an officer has reasonable suspicion to conduct a stop include "an area's propensity toward criminal activity," <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993), an unverified tip by a known informant, <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990), and evasive conduct, <u>United States v. Sprinkle</u>, 106 F.3d 613, 618 (4th Cir. 1997).

"Evasive conduct can, of course, assist an officer in forming reasonable suspicion." <u>Sprinkle</u>, 106 F.3d at 618. However, all of Childress's arguably evasive conduct that defendants point to occurred after Demalo stopped Childress. The question here is whether Demalo observed Childress acting evasively prior to the stop so that Demalo had reasonable suspicion to stop and question Childress, and defendants do not cite to any evidence that suggests that Childress was acting evasively prior to Demalo approaching here. <u>See</u> <u>United States v. Massenburg</u>, 654 F.3d 480, 489 (4th Cir. 2011) (finding lack of reasonable suspicion in part because the officer did not observe any nervous behavior by the defendant until after they made contact). To the extent that defendants rely upon Childress's supposedly evasive conduct in order to justify Demalo's prolonging of the stop, there is a genuine issue of material fact as to whether Childress was acting evasively. Viewing the account of what happened in the light most favorable to Childress, a jury could believe that Childress was forthright with Demalo, provided Demalo with her name and her mother's address within the apartment complex, told Demalo she was going inside to get her identification, and truly was attempting to get her identification, meaning that her conduct was not evasive. According to Childress, she "definitely wanted to tell [Demalo] who [she] was, and [she] wanted to verify completely

who [she] was to Demalo." Childress Depo. 98:15–20. This account of Childress's and Demalo's initial interaction does not suggest any evasive conduct on the part of Childress.

With regard to an area's propensity toward criminal activity, "[a]lthough being seen in a high crime district carries no weight standing alone, an area's disposition toward criminal activity is an articulable fact that may be considered along with more particularized factors to support a reasonable suspicion." Sprinkle, 106 F.3d at 617 (internal quotations omitted). Here, both parties admit that the apartment complex where the incident occurred is located in a high-crime area. While this fact is certainly not dispositive, the court may consider it in determining whether Demalo had reasonable suspicion.

As to a tip from an informant, "[t]he degree to which the police may rely on a tip to establish reasonable suspicion depends on the tipster's veracity, reliability, and basis of knowledge." United States v. Kehoe, 893 F.3d 232, 238 (4th Cir. 2018), cert. denied, 139 S. Ct. 842 (2019). Here, the tip came from a concerned citizen calling 911. A 911 caller can provide reasonable suspicion for an officer to initiate a Terry stop if the caller is sufficiently reliable. United States v. Quarles, 330 F.3d 650, 654 (4th Cir. 2003). To determine if the caller is sufficiently reliable, the Fourth Circuit has considered several factors, including whether the call was anonymous, whether the caller provided enough information "to test his knowledge or credibility," and whether the caller provided sufficient information to be held accountable for his statement." Id. at 655–56.

For example, in United State v. Talley, the Fourth Circuit applied these factors to determine that officers had reasonable suspicion to conduct a Terry stop of the defendant

after receiving a 911 call from a woman who reported that the defendant was viewing child pornography on a computer at a public library. 392 F. App'x 129, 131 (4th Cir. 2010). The court first noted that while the 911 caller did not initially provide her name, the dispatcher had a phone number for the caller at which officers could reach the caller. Id. at 133. In addition, the caller's description of the defendant, his location in the library, and the nature of the conduct "strongly suggested" that the 911 caller observed the conduct first hand. Id. Finally, the court noted that when officer located a man fitting the description provided by the 911 caller, the defendant began to act evasively. Id. at 14.

Here, the 911 caller provided her name and phone number and explained that she was a resident of the apartment complex who observed a woman and a man acting suspiciously. The fact that the caller lived in the apartment complex and described the suspicious circumstances as she observed them shows that the caller observed the behavior she was reporting first hand, like the caller in Talley. Moreover, the caller's description of "a young woman walking back and forth" who was wearing shorts and a sweatshirt matched a description of Childress, indicating reliability. However, the Supreme Court has explained that "[a]n accurate description of a subject's readily observable location and appearance" is reliable in a limited sense in that it helps the police identified the accused, but it "does not show that the tipster has knowledge of concealed criminal activity." Florida v. J.L., 529 U.S. 266, 272 (2000).

Importantly, the 911 caller here did not specifically observe or report any illegal behavior, while the caller in Talley did, having seen the defendant looking at child pornography. In contrast, Demalo was responding to a vague report of "suspicious behavior" based on a "strange car parked in the back, a young woman walking back and

forth, then a young man walking through the pl [sic] that [the caller] has never seen before." ECF No. 46-2 at 2. The question is whether Demalo had a reasonable suspicion that "criminal activity [was] afoot," <u>Illinois</u>, 528 U.S. at 123, and the 911 caller's report mentioned no suspected criminal activity at all.

Moreover, the fact that the area is generally known as a high-crime area adds little to the tip, and there is no dispute that Childress was not active evasively prior to Demalo approaching her. Whether Childress subsequently acted in an evasive manner, potentially justifying Demalo's seizure of Childress, is a genuine issue of material fact, as Demalo's account of the interaction suggests evasive conduct while Childress portrays her role in the interaction as being cooperative and forthright. Given the totality of the circumstances and the issue of fact as to Childress's behavior, the court denies summary judgment on this claim as to Demalo.[3] Notably, defendants do not argue here that even if Demalo violated Childress's constitutional right, a reasonable officer would not have understood that the conduct at issue violated a clearly established right.

Defendants also argue that summary judgment is warranted as to Bennett on this claim because he was not present for the initial stop of Childress. Childress does not address this argument in her response. The court agrees with defendants and grants summary judgment on this claim as to Bennett.

---

[3] To the extent that Childress argues that the post-incident investigation report shows that Demalo did not have reasonable suspicion to stop and question Childress, this argument should be disregarded. Demalo clearly testified that "looking at it now, I had nothing" to justify the detention. ECF No. 51-4, Demalo Depo. 66:18. But the court's inquiry is not one that is made in hindsight—reasonable suspicion is determined at the time of the incident.

**b. Excessive Force**

Childress next claims that Demalo and Bennett used excessive force against her. "A claim that a police officer employed excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard." Smith v. Ray, 781 F.3d 95, 100–101 (4th Cir. 2015) (quoting Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)); see also Tolan v. Cotton, 572 U.S. 650, 656 (2014) ("When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures"). The officer's alleged conduct is not excessive if it is "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Smith, 781 F.3d at 101 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). In considering the reasonableness of an officer's actions, a court "must consider the facts at the moment that the challenged force was employed." Id.

Analyzing the reasonableness of an officer's alleged actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). A court must also give "careful attention to the facts and circumstances of each particular case, including" three factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" Ray, 781 F.3d at 101 (quoting Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)).

Defendants argue that Demalo's first use of force, placing her hand on Childress's shoulder, was minimal and consistent with the situation, namely, encouraging a suspect to remain at the scene while a police officer finishes her investigation. Defendants then argue that Childress escalated the situation by screaming and calling someone on the phone who was unknown to Demalo at the time. Defendants explain that Demalo had no way of knowing who Childress was calling, and because Demalo never located the second reported suspicious person, it was reasonable for Demalo to be concerned that she was getting set up to be ambushed. Defendants argue that this necessitated additional force from Demalo to detain Childress and secure the situation. Moreover, defendants argue that force was necessary because Childress was attempting to evade arrest, and defendants also note that Demalo did not use any weapons.

Childress disagrees, arguing that Demalo's use of force against her was excessive. This stems largely from the differences in Childress's account. Childress claims that it was Demalo who escalated the situation by putting her hand on Childress's shoulder when Childress was simply trying to retrieve her identification. In addition to the general struggle between Demalo and Childress, Childress also points to the force used when Demalo allegedly grabbed Childress's breast and twisted her nipple.

Viewing the facts in light most favorable to Childress, the force employed by Demalo includes both Demalo placing her hand on Childress's shoulder and Demalo grabbing Childress's breast and twisting Childress's nipple. Applying the Graham factors to determine whether Demalo's force was excessive, beginning with severity of the crime, the only potential crime that was at play here was disorderly conduct. Disorderly conduct is not a particularly severe crime, a factor that weighs in favor of

Childress.  Next, Childress may have appeared to pose some threat to Demalo, as Demalo was concerned that Childress was calling someone to come to the scene.  However, Demalo never indicated that she suspected Childress to be armed nor does she claim that Childress tried to hurt her in any way.  Demalo stated that Childress was screaming, but she doesn't claim that Childress was threatening her or even using profane language.  Therefore, this factor also weighs in favor of Childress.  As to the final Graham factor, it does appear that Childress was resisting Demalo in some manner, but it is unclear whether Demalo was attempting to arrest Childress while they were struggling and Childress was resisting her.  Considering these factors together, and viewing the evidence in light most favorable to Childress, the court concludes that there is a genuine issue of material fact as to whether Demalo employed excessive force against Childress.

With regard to Bennett's interaction with Childress, the testimony regarding Benentt's alleged use of force also differs.  Bennett stated that Childress's body went limp, he lost his balance, and they fell to the ground with Bennett on top.  According to this account, Bennett did not consciously use force to slam Childress to the ground but instead merely fell by accident.  Childress's account of what happened is a little unclear.  Childress initially stated that during her struggle with Demalo, which immediately proceeded her interaction with Bennett, she did not know if Demalo ever tased her because she "did completely black out, and when I came back from--when I was gaining my senses back, I can't tell you why I ended up in the position that I ended up in."  Childress Depo. 102:25–103:4.  In describing that position, Childress stated that "as I was on the phone with 911, I was thrown head first to the ground . . . I was slammed to the ground, and the neighbors came out, and so I was in complete darkness, and I couldn't

hear. I couldn't feel. I couldn't see." Id. 103:6–12. Later in her deposition, Childress stated again that she wasn't sure if Demalo pulled out a weapon because she "blacked out" and "was completely and totally in darkness" so that she "couldn't hear, see, or feel anything." Id. 111:18–20. Defendants argue that Childress's testimony that she blacked out is consistent with Bennett's account of Childress going limp, meaning that there is no factual dispute as to the interaction between Bennett and Childress, and that Bennett did not use excessive force because he merely lost his balance and fell to the ground with Childress after her body went limp.

However, some of Childress's deposition testimony indicates that she was "slammed to the ground" and that she did not black out until she was on the ground. Childress clarified that she did not black out until "[a]fter [she was] slammed to the ground." Id. at 103:13–16. Indeed Childress's testimony indicates that she remembers being thrown to the ground and then blacking out: "Demalo and some other officers slam[med] me to the ground head first at the cement, and my -- and if felt like my head popped off, and I'm sending out a bloodcurdling scream that I had never -- I mean, it's just that -- that's just how it sounded. I-- and then I'm in complete darkness." Id. at 106:18–23. Viewed in the light most favorable to Childress, her deposition testimony is sufficient to create a genuine issue of material fact as to whether Bennett consciously employed force by slamming Childress to the ground.

Assuming that Bennett did slam Childress to the ground and applying the Graham factors, the court finds that there is a genuine issue of material fact as to whether Bennett employed excessive force. With regard to the first factor, the severity of the supposed crime—disorderly conduct—is low. Moreover, there did not appear to be any immediate

threat to Bennett. Childress was not armed and does not appear to have tried to hit or otherwise harm Bennett. Again, it is unclear whether Childress was actively resisting arrest, as there has been no evidence to show whether Demalo was arresting Childress during the struggle. Based on Bennett's testimony, he believed that Demalo was effectuating an arrest, and to be sure, "[i]t is . . . well established that the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest." Brown, 278 F.3d at 369. However, a jury could find that the amount of force Bennett used was beyond the degree of force that was required to effectuate Childress's arrest.

Defendants also argue that even if the court finds that Childress's right to be free from excessive force was violated, Demalo and Bennett are still entitled to qualified immunity because their conduct did not violate an established right. In support of this, argument, defendants simply argue that the officers' actions were objectively reasonable. However, that is not the basis of the inquiry for entitlement to qualified immunity. Instead, defendants must show that Demalo's conduct did not violate a clearly established right of which a reasonable officer would have known. Defendants do not make this argument, nor do they cite to any law that supports their argument. As such, the court denies summary judgment as to Demalo and Bennett on the excessive force claim.

### c. False Arrest

Childress also claims that she was falsely arrested. A § 1983 claim for false arrest relates to a person's right to be free from unreasonable seizure. Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002). "To establish an unreasonable seizure under the Fourth Amendment, [the plaintiff] needs to show that the officers decided to arrest her . . .

without probable cause." Id.  "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed." Id.  "Two factors govern the determination of probable cause in any situation: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'"  Id. at 368 (quoting Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992)).

Here, Childress was arrested for disturbing the peace in violation of North Charleston Ordinance § 13-36.  This ordinance states that "[a] person shall be guilty of disorderly conduct, which is hereby prohibited, if, with the purpose of causing public danger, alarm, disorder, nuisance, or if [her] conduct is likely to cause public danger, alarm, disorder or nuisance, [she] willfully does any of the following acts in public." ECF No. 62-1 at 1.  Defendants argue that Childress could have been properly charged under any of the following acts:

> (1) Commits an act in a violent and tumultuous manner toward another whereby that other is placed in danger of his life, limb or health;
>
> (2) Commits an act in a violent and tumultuous manner toward another whereby the property of any person is placed in danger of being destroyed or damaged.
>
> (3) Causes, provokes or engages in any fight, brawl or riotous conduct so as to endanger the life, limb, health, or property of.
>
> (9) Resists or obstructs the performance of duties by the city police or any other authorized official of the city, when known to be such an official.
>
> (11) Addresses abusive language or threats to any member of the city police department, any other authorized official of the city who is engaged in the lawful performance of his duties, or any other person when such words have a direct tendency to cause acts of violence. Words merely causing displeasure, annoyance or resentment are not prohibited.

> (13) Makes or causes to be made any loud, boisterous or unreasonable noise or disturbance to the annoyance of any other persons nearby, or near to any public highway, road, street, lane, alley, park, square, or common, whereby the public peace is broken or disturbed or the traveling public annoyed.

Id. Childress argues that she did not act in a manner consistent with any of these acts.

The court finds that, considering Childress's conduct and the contours of the disturbing the peace ordinance, there is a genuine issue of material fact as to whether probable cause existed for Childress to be arrested for violating this ordinance. Defendants claim that Demalo had probable cause because Childress "caused a crowd to form and come closer to where Demalo was struggling with Plaintiff." ECF No. 46-1 at 12. However, this does not fall into any of the categories of disturbing the peace that are listed above, especially since defendants don't claim that the crowd created any sort of danger. Defendants also argue that Childress's "conduct provoked public alarm and potential disorder." Id. Again, this doesn't fit into any of the sections above.

Viewing Childress's conduct in the light most favorable to her, Childress's conduct consisted of providing her name and her mother's address to Demalo, holding onto a fence while struggling with Demalo, and calling 911. Childress maintains that she did not scream until her hip was dislocated, and there is no evidence to suggest that Childress was using profanity or abusive language toward Demalo or anyone else. Childress's conduct could be interpreted as resisting the performance of duties by the police by struggling with Demalo and calling 911, but viewing the facts in the light most favorable to Childress, a jury could find that Childress was trying to cooperate with Demalo and Childress's

actions were a result of Demalo escalating the situation. As such, there is a genuine issue of material fact as to whether Demalo had probable cause to arrest Childress for disorderly conduct.

Defendants argue that even if the court finds that Demalo arrested Childress without probable cause, Demalo should be entitled to qualified immunity because her conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person should have known." ECF No. 46-1 at 12–13 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In order for an officer to be entitled to qualified immunity, "the plaintiff's rights must be clearly established under the particular circumstances confronting the official at the time of the questioned action." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991). However, the Supreme Court "'do[es] not require a case directly on point' in order to conclude that the law was clearly established so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" Smith, 781 F.3d at 100 (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011)); see also Vathekan v. Prince George's Cty., 154 F.3d 173, 179 (4th Cir. 1998) ("A prior case holding identical conduct to be unlawful is not required."). Defendants argue that they have been unable to find any cases involving a similar factual scenario that would have put Demalo on notice that her conduct violated a clearly established right. Childress does not respond to this argument.

Despite defendants' argument, the Fourth Circuit has clearly held that "the Fourth Amendment right to be arrested only on probable cause is clearly established." Henderson v. Simms, 223 F.3d 267, 273 (4th Cir. 2000); see also

<u>Clark v. Link</u>, 855 F.2d 156, 162 (4th Cir. 1988) ("A warrantless arrest without probable cause is a violation of the Fourth Amendment."); <u>Harrison v. Prince William Cty. Police Dep't</u>, 640 F. Supp. 2d 688, 702 (E.D. Va. 2009) ("The requirement that an officer have probable cause to seize and arrest an individual has been clearly established constitutional law for decades."). There need not be a case with facts that is "directly on point," <u>Smith</u>, 781 F.3d at 100, as defendants seem to suggest. Therefore, the court denies summary judgment as to Demalo on the false arrest claim.

With regard to Bennett, defendants argue that summary judgment is warranted because Bennett arrived late to the scene and was able to assume the lawfulness of the arrest. At the hearing on the motion, Childress's counsel conceded that Bennett could not be liable for false arrest when he was not the officer who made the arrest. Therefore, the court grants summary judgment as to Bennett on this claim.

### d. Due Process Violations

Childress has also alleged that Demalo and Bennett violated her due process rights under the Fifth and Fourteenth Amendments. Defendants argue that the Fifth Amendment does not apply to Demalo and Bennett because they are not federal officials, and that the Fourth Amendment governs the officers' actions here, not the Fourteenth Amendment. At the hearing on the motion, Childress's counsel clarified that Childress was only pursuing claims based on the alleged violation of Childress's Fourth Amendment rights. Therefore, the court grants summary judgment to Demalo and Bennett as to Childress's Fifth and Fourteenth Amendment claims.

**B. The City**

Defendants also argue that they are entitled to summary judgment on Childress's malicious prosecution and gross negligence claims against the City. At the hearing on the motion, Childress's counsel told that court that he would like to withdraw these state law claims in order to re-file them in state court, and defendants' counsel agreed to the withdrawal. As such, the court dismisses without prejudice the state law claims brought against the City.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion for summary judgment as to the Fifth Amendment and Fourteenth Amendment claims against Demalo, and as to the Fifth Amendment, Fourteenth Amendment, stop and seizure, and false arrest claims against Bennett. The court **DENIES** the motion as to the stop and seizure, excessive force, and false arrest claims against Demalo and as to the excessive force claim against Bennett. In addition, the court **DISMISSES** without prejudice the claims against the City.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 27, 2019**
**Charleston, South Carolina**